# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PAUL WASKEY, *et al.*,                              *

      Plaintiffs,                              *

v.                                                 *        Civil Action No. 8:18-02824-PX

ERIKA O'NEAL, *et al.*,                            *

      Defendants.                              *

                  ***

## <u>MEMORANDUM OPINION</u>

Presently pending in this commercial contract dispute is Plaintiffs' motion for summary judgment.  ECF No. 68.  Defendants have failed to respond.  Finding no hearing necessary, *see* D. Md. Loc. R. 105.6, the Court GRANTS in part and DENIES in part Plaintiffs' motion.

## I.    BACKGROUND[1]

In 2009, Plaintiffs Paul Waskey, Ben Waskey, Trent Waskey, Lois Waskey, and Linda Wootten ("Plaintiffs") founded a small, family-owned business, Regalmark, Inc. ("Regalmark"), which provided contract furniture, moving and space design planning services, and space efficiency consulting.  *See* ECF No. 32-1 at 3.  Under Plaintiffs' stewardship, Regalmark built an impressive client base, including such federal agencies as the United States Department of Justice ("DOJ") and the Transportation Security Administration, as well as state government agencies, higher education institutions, and government prime contractors.  *Id.* at 3, 7.

On November 6, 2017, Plaintiffs agreed to sell Regalmark to Erika O'Neal and Dennis

---

[1] Plaintiffs Paul Waskey and Ben Waskey have provided sworn declarations attesting to the veracity of "facts and events" described in Plaintiffs' Amended Complaint and motion for summary judgment.  *See* ECF No. 68-28.  Accordingly, the Court construes those facts as part of the record evidence.  *See, e.g.*, *In re Howes*, 563 B.R. 794, 797 n.3 (D. Md. 2016) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *White v. White*, 886 F.2d 721, 722–23 (4th Cir. 1989) (explaining that a court has an "obligation to construe liberally the pleadings of a pro se litigant").  Except where otherwise indicated, the facts recounted below are undisputed.

Alexander ("Defendants") for $420,000.00 so that Plaintiffs could launch a new business, Structen Group.  *See* ECF Nos. 68-13, 68-14.  The sale of Regalmark closed the following month, and the terms of the agreement were memorialized in five documents: the Business Prospectus & Entity Sale Agreement (ECF No. 68-12); Stock Purchase Agreement (ECF No. 68-13); Amendment of Entity/Stock Sale Agreement (ECF No. 68-14); Promissory Note (ECF No. 43-3); and Security Agreement for Entity Sale (ECF No. 43-4) (collectively the "Sales Agreement" or "Agreement").

Although not a model of clarity, the Sales Agreement memorialized the following terms relevant to this matter.  Plaintiffs agreed to sell Regalmark as an ongoing business for $420,000.00, with $160,000.00 due at closing, followed by 48 monthly installments until the remaining balance was paid, and subject to 6% annual interest.  ECF No. 68-13 at 1–3.  The parties also memorialized those assets of Regalmark that were *not* part of the sale, to include loans receivable, cash on hand, the security deposit for the leased space, the commercial client base, money market accounts, and other like assets.  ECF No. 68-12 at 11.  Likewise, the Sales Agreement noted certain excluded liabilities such as accounts payable already paid to vendors, loan balances on lines of credit, and any other liabilities further defined in the Sales Agreement. *Id.*

As part of the Sales Agreement, Plaintiffs made certain warranties to Defendants, including that at the time of sale, all outstanding business loans would be satisfied, and Plaintiffs would provide in advance of closing any outstanding liabilities.  ECF No. 68-13 at 3.  Plaintiffs additionally agreed not to compete with Regalmark for 60 months.  *Id.*  The parties also preserved as a contract option the possibility that the sellers would transfer to the buyers Regalmark's existing lease agreement for its Washington, D.C. office.  ECF No. 68-12 at 7, 11.

Indeed, sometime after the Sales Agreement was executed, Plaintiffs transferred that lease to Defendants (ECF No. 15 at 4), but in the interim, Plaintiffs made the January and February 2018 rent payments totaling $9,048.30, on the condition that Defendants reimburse those payments within six to nine months. *Id.*; *see also* ECF No. 68-27 at 2–3.

The Sales Agreement also contemplated that the parties would continue to work with each other so to both wrap up the sale of the business and maximize its ongoing value. ECF No. 68-12 at 12. Accordingly, the Sales Agreement left open the possibility of future negotiations that would allow current Regalmark at-will employees to continue working under new ownership until 2018 when they would transition to Structen Group. *Id.*

After the parties closed on the Regalmark sale, they were frequent collaborators. For example, they agreed on a framework to deal with payments on accounts receivable. ECF No. 68-14 at 1. The parties agreed that they would split the gross proceeds received between the settlement date, December 14, 2017, to December 31, 2017 under terms set forth in the Agreement. *Id.* Regalmark and Structen Group also operated from the same office building; Plaintiffs retained keys to Regalmark's office suite; and Plaintiffs actively helped train Regalmark employees. *See* ECF Nos. 15 at 6–7; ECF No. 68-9 at 7.

The parties' finances also remained interconnected. They agreed that two Regalmark bank accounts previously controlled by Plaintiffs would stay open to resolve any outstanding accounts payable or receivable. *See* ECF No. 15 at 4; ECF No. 68-8; ECF No. 68-24. To that end, Plaintiffs prepared monthly reconciliation reports, which captured outstanding amounts each party owed to the other. *See* ECF No. 68-10 at 2.

In short order, however, this business relationship deteriorated. *See, e.g.*, ECF No. 68-10 at 4–5. Tensions flared over Defendants' continued use one of the Plaintiffs' credit card

3

accounts to pay for purchases related to the new business totaling $21,906.97. *See* ECF No. 68-1 at 46–47; ECF No. 68-10 at 4; ECF No. 68-24 at 1–2. Likewise, between June 8, 2018 and June 12, 2018, Regalmark's government client, the DOJ, paid a total of $76,166.29 in seven payments, some of which was for work performed before the sale of the business—and thus owed to Plaintiffs—while only two payments were properly owed to Defendants. *Compare* ECF No. 15 ¶¶ 11, 23 *with* ECF No. 32 ¶¶ 11, 23. *See* ECF Nos. 15-5, 68-16, 68-17, 68-18, 68-19, 68-20. O'Neal, however, directed the DOJ to reverse four of the payments totaling $45,000.00, without Plaintiffs' consent.[2] *See* ECF No. 15 at 6; ECF No. 15-5.

By this point, the parties' business dealings nearly ground to a halt. Defendants had not reimbursed Plaintiffs for outstanding rental payments, improper supplier charges, or revenue incurred prior to the Sales Agreement. ECF No. 15 at 4. Nor had Defendants made any monthly payments on the sale of the business itself. *Id.* at 3. Nonetheless, on July 16, 2018, Plaintiffs, per the Agreement, referred a longtime friend and client, Ian MacGregor ("MacGregor"), to O'Neal and Regalmark for a new business opportunity. ECF No. 68-23 at 1–2. Ben Waskey specifically noted that Regalmark, under new ownership, could handle the job, and he urged O'Neal to provide MacGregor the requested quote. *See id.* at 1, 6–8. O'Neal failed to respond to either MacGregor or the Waskeys. Understandably frustrated by O'Neal's silence, Paul Waskey now emailed MacGregor, copying O'Neal, telling MacGregor that Plaintiffs "have evidence that [O'Neal] has evaded us, locked out all accounts, potentially committed fraud with regards our government contracts as of July 18th and is in breach of contract." *Id.* at 4. Accordingly, Paul

---

[2] The record reflects slightly different amounts regarding the DOJ payment reversal. *Compare* ECF No. 68-1 at 27 (identifying $45,000.00 as the amount in question) *with* ECF No. 32 ¶ 11 (identifying $46,000.00 as the amount in question); *see also* ECF No. 15 at 3 ("DOJ only was able to withdraw $46,363.01"). Because the $45,000.00 amount is the most conservative figure, the Court accepts it as the amount in question.

Waskey "cautioned" MacGregor against doing any further business with O'Neal and Regalmark. *Id.*

Plaintiffs filed suit against Defendants a month later, asserting common law claims for breach of contract, unjust enrichment, and fraud.  *See* ECF No. 1; *see also* ECF No. 15. Specifically, Plaintiffs maintain that Defendants' failure to pay any monthly sums under the Sales Agreement alone constitutes a material breach of its terms.  Additionally, Plaintiffs seek reimbursement for Defendants' unauthorized credit card expenses, the security deposit for the Regalmark commercial lease, and two months' rent that Plaintiffs paid on Defendants' behalf. ECF No. 15.  Defendants, in turn, filed counterclaims for breach of contract, fraud in the inducement, defamation, unjust enrichment, and recission of contract.  The parties next engaged in protracted discovery, at which point Defendants lost their legal representation.  At the close of discovery, Plaintiffs moved for summary judgment in their favor as to each claim and counterclaim.  ECF No. 68-1 ¶ 3.  Defendants did not respond.

## II.    STANDARD OF REVIEW

"[I]n considering a motion for summary judgment, the district court 'must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.'"  *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 409 n.8 (4th Cir. 2010) (quoting *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993)) (emphasis omitted).   An entry of summary judgment is appropriate when the court concludes that there is no genuine issue of material fact because the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  In conducting this analysis, however, a court may not weigh evidence or make credibility determinations.  *Id.* at 255 ("Credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").  Notably, the non-moving party's lack of response "does not fulfill the burdens imposed on moving parties by Rule 56."  *Custer*, 12 F.3d at 416.  Rather, the Court must independently assess the sufficiency of the evidence in the light most favorable to the non-moving party to determine whether judgment as a matter of law is proper.  *See id.*

## III.    ANALYSIS

### A.    Plaintiffs' Claims

Plaintiffs' summary judgment motion addresses the viability of all claims and counterclaims.  ECF No. 68.  The Court first turns to the propriety of summary judgment as to Plaintiffs' claims and next to the requested judgment in Plaintiffs' favor as to Defendants' counterclaims.

#### 1.    Breach of Contract

Plaintiffs' breach of contract claim centers on the Sales Agreement, which clearly amounts to a binding agreement between the parties.  *See Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94 (2000) (describing the elements of an express contract); *see also* ECF Nos. 32-1, 32-2, 32-3, 32-4, 32-5.[3]  Plaintiffs first contend that the undisputed evidence demonstrates that Defendants breached the agreement by defaulting on their monthly payments for the sale of the business.

For a plaintiff to prevail on a breach of contract claim, the plaintiff need demonstrate only that he was owed a contractual duty by the defendant, and that the defendant breached that duty.

---

[3] The Sales Agreement includes a choice-of-law provision that requires the contract to be "governed by and construed in accordance with the laws of the State of Maryland."  ECF No. 68-13 ¶ 10.  The Court therefore interprets the Agreement in accordance with Maryland law.

*Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001); *see also* 10 Corbin on Contracts § 53.1 (2021). A defendant may also breach a contract by preventing or hindering "the other party's performance of a contract." *See* 10 Corbin on Contracts § 53.5 (2021). When viewing the record most favorably to Defendants, it is wholly undisputed that Defendants breached the Sales Agreement.

The Sales Agreement unambiguously provides that Defendants would make 48 monthly installment payments to satisfy the $260,000.00 remaining on the purchase price for Regalmark. Defendants have paid nothing at all. Consequently, and pursuant to the plain terms of the Agreement, Plaintiffs are owed a total of $328,244.01, which encompasses both the principal and interest payments contemplated in the Promissory Note. On the breach of contract claim, therefore, summary judgment is granted in Plaintiffs' favor for the total amount owed under the contract.

Plaintiffs next seek relief for Defendants' failure to reimburse them for the lease-related payments, specifically to return to Plaintiffs the security deposit on the lease and to reimburse Plaintiffs for the two months' rental payments that Plaintiffs paid on Defendants' behalf in the beginning of 2018. As to the security deposit, the Sales Agreement unambiguously provides that it was not part of the sale, but rather a remaining asset of Plaintiffs. *See* ECF No. 68-12 at 11. Defendants never returned the deposit of $8,466.84. ECF No. 68-1 at 74; *see also* ECF No. 68-27 at 1. Accordingly, Defendants have breached this provision of the Agreement as a matter of law.

Third, Plaintiffs contend that Defendants' failure to reimburse two rent payments totaling $9,048.30 that were charged to Plaintiffs' credit cards also amounts to a breach. *See* ECF No. 15 at 4; ECF No. 68-1 at 48. Plaintiffs evidently paid the rent for January and February 2018 "at the

7

request and on behalf of Ms. O'Neal," pursuant to an "understanding [that] she would reimburse the payments within 6-9 months." *See* ECF No. 15 at 4. The credit card records reflect that Plaintiffs indeed paid these sums and have not been reimbursed. *See* ECF No. 68-27 at 2–3. Thus, viewing the record most favorably to Defendants, the breach is clearly established. Plaintiffs are entitled to $9,048.30 in unreimbursed rental payments.

Lastly under the contract claim, Plaintiffs contend that Defendants were obligated, and failed, to remit the DOJ payments to Plaintiffs. *See* ECF No. 15 at 3, 7; ECF No. 68-1 at 30–31. Two provisions in the Sales Agreement are especially pertinent to this purported breach. First, the Sales Agreement made clear that accounts receivables generally are not "assets" transferred as part of the sale. ECF No. 68-12 at 11. Second, the Agreement made clear that receivables reflecting "sales which [were] processed and billed" between December 14, 2017 and December 31, 2017 (the "transition period"), were to be split between buyers and sellers "50% GP." ECF No. 68-14.

The record reflects that three DOJ payments are attributed to sales orders totaling $26,906.50 that predate the "transition period." *See* ECF Nos. 68-16, 68-17, 68-18. Thus, by the terms of the Agreement, those payments belonged only to Plaintiffs. By contrast, two of the payments (totaling $32,681.68) pertain to sales orders dated December 21, 2017, during the transition period. *See* ECF Nos. 68-19, 68-20. Accordingly, the latter payments are subject to the parties' "split" agreement. *See* ECF No. 68-14 at 1. As to this, the only reasonable interpretation of the term "50% GP" is that the parties would divide equally the profits between Plaintiffs (as essentially old Regalmark) and Defendants (as new Regalmark). *See Credible Behav. Health v. Johnson*, 466 Md. 380, 395 (2019) (explaining that courts construe unambiguous contractual language according to ordinary and accepted meanings). Put

differently, had the parties intended to split the gross profits any other way, it would have specified that arrangement in the contract.

Alternatively, even if the Court found the "split" provision of the Sales Agreement ambiguous, the Court would be entitled to consider evidence beyond the four corners of the contract to ascertain the parties' intentions. *Id.* at 394. The record in this case, viewed most favorably to Defendants, clearly demonstrates that the parties intended to split evenly those proceeds. Most importantly, the reconciliation report prepared for all outstanding amounts owed specifically states that gross profit on other project receivables shall be split "50%." ECF No. 68-10 at 2. Thus, the record unambiguously supports that those profits must be split evenly between the parties. *See Aziken v. District of Columbia*, 70 A.3d 213, 222 (D.C. 2013) (noting that a court should look to contemporaneous evidence of the parties' negotiations when interpreting an ambiguous contract).

As to the DOJ invoices, therefore, Plaintiffs were entitled to one half, or $16,340.84, in transition period gross profits. Plaintiffs were also entitled to $26,906.50, which represents the three payments for sales that occurred before the transition period. Thus, of the total DOJ payments of $76,166.29 to the M&T Bank account, Plaintiffs were entitled to $43,247.34 per the terms of the Agreement. Plaintiffs only received $31,166.29. Accordingly, on this claimed breach, Defendants owe Plaintiffs an additional $12,081.05 as the additional portion of the "transition period" payments.

In sum, Plaintiffs motion for summary judgment on the breach of contract claim is granted. As relief, Plaintiffs are entitled to $328,244.01 for Defendants' breach of the Promissory Note; $8,466.84 as reimbursement for Regalmark's security deposit; $9,048.30 for Regalmark's January and February 2018 rent payments; and $12,081.05 for Defendants'

improper retention of the DOJ payments. The total damages awarded on this claim, therefore, amount to $357,840.20.

## 2.   Unjust Enrichment

Plaintiffs separately seek judgment in their favor for various credit card charges totaling $21,906.97, invoking the quasi-contract theory of unjust enrichment. Unjust enrichment is fundamentally an equitable remedy. *See generally Hill v. Cross Country Settlements, LLC*, 402 Md. 281 (2007). The claim focuses not on compensating the plaintiff, but on requiring the defendant to relinquish benefits that it would be unjust for her to keep. *See Mass Transit Admin. v. Granite Constr. Co.*, 57 Md. App. 766 (1984). To prevail, a plaintiff must demonstrate that (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of the benefit; and (3) the defendant accepted the benefit under circumstances that would make it inequitable for the defendant to retain the benefit without the payment of its value. *Flynn v. Duvall*, No. DKC 2008-0370, 2008 WL 11510290, at *2 (D. Md. July 11, 2008) (citing *Hill*, 402 Md. at 295).

When viewing the record most favorably to Defendants, Plaintiffs are entitled to judgment on this claim. The record evidence indisputably demonstrates that Defendants benefited from using the Plaintiffs' Chase Bank charge card to incur business expenses not covered under the Sales Agreement. *See* ECF No. 68-24. Likewise, Defendants full well knew that they were charging items without Plaintiffs' authorization. *See* ECF No. 68-10 at 4. Lastly, to allow Defendants to retain the amounts charged would permit Defendants to reap the rewards of their business dealings while shifting the costs to Plaintiffs, even though Defendants at the time owned and operated Regalmark. Summary judgment on this claim is granted to Plaintiffs, and they are therefore entitled to an additional award of $21,906.97.

### 3.    Fraud

The Amended Complaint, liberally construed, alleges that Defendants committed fraud in connection with Defendants' representations to the DOJ related to the agency's 2018 payments to Regalmark.  *See* ECF No. 15 at 3, 8.  Plaintiffs take issue with O'Neal's urging the DOJ to reverse the installment payments, which deprived Plaintiffs of the revenues owed during the transition period.  *See* ECF No. 68-1 at 30–31.  When viewing the record evidence most favorably to Defendants, the Court cannot grant judgment in Plaintiffs' favor on this claim.[4]

As a preliminary matter, the Court must determine which substantive state law applies. "Maryland adheres to the *lex loci delicti* rule in analyzing choice of law problems with respect to causes of action sounding in torts." *Phillip Morris Inc. v. Angeletti*, 358 Md. 689, 744 (2000). Under *lex loci delicti*, a court applies the substantive law of the state where the harm occurred, or where the plaintiff suffered injury.  *Id.* at 746.  All Plaintiffs, save for Wootten, reside in Maryland.  Further, the Amended Complaint alleges that the purported fraud harmed each of them but is otherwise silent that the harm took place anywhere other than Maryland, and the parties do not dispute that Maryland law applies.  Accordingly, the Court applies Maryland law.

To prevail on a common law fraud claim, Plaintiffs must demonstrate by clear and convincing evidence that (1) the defendant made a false representation to the plaintiff; (2) the falsity was known to the defendant or made with reckless indifference to its truth; (3) the misrepresentation was made for the purpose of defrauding the plaintiff; (4) the plaintiff relied on

---

[4] Plaintiffs' summary judgment motion relies heavily on the elements of federal criminal wire fraud.  ECF No. 68-1 at 4.  This argument neither assists the Plaintiffs nor the Court because a civil litigant may not pursue a private cause of action for alleged commissions of a crime.  *See Tani v. President/CEO, Salomon Bros. Realty Corp./Citigroup*, No. CCB-03-2566, 2005 WL 1334604, at *4 n.5 (D. Md. May 31, 2005) (explaining that the wire fraud statute was "not intended to be used in civil litigation or as a basis for a private right of action"); *see also Doe v. Wooton*, No. JKB-18-812, 2018 WL 11312950, at *1 (D. Md. Apr. 16, 2018) (dismissing *sua sponte* a case that prayed for relief based on criminal statutes that provided no private right of action).

the misrepresentation and had the right to rely on it; and (5) the plaintiff suffered compensable injury resulting from the misrepresentation. *See Klassou v. Ejtemai*, No. 1162, 2017 WL 4271674, at *4–5 (Sept. 26, 2017) (citing *Rozen v. Greenberg*, 165 Md. App. 665, 674 (2005)); *see also Sass v. Andrew*, 152 Md. App. 406 (2003).[5]

As to the first element, no evidence supports that any purported false statements were made to the Plaintiffs for purposes of defrauding them. Rather, O'Neal directed her falsehoods to the DOJ to induce reversal of its payments into the Plaintiffs' bank account. Stated simply, the DOJ relied on such representations, not Plaintiffs. Thus, the claim fails as to this essential element.

Because the fraud claim cannot be sustained as a matter of law, the Court denies Plaintiffs' motion for summary judgment. Further, because no set of facts could sustain the fraud claim, the Court dismisses it *sua sponte* and with prejudice. *See, e.g.*, *Baker v. Dir., U.S. Parole Comm'n*, 916 F.2d 725, 726 (D.C. Cir. 1990) (explaining that a trial court may dismiss a claim *sua sponte* if the claimant has no possibility of relief); *Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987) ("A trial court may dismiss a claim *sua sponte* under Fed. R. Civ. P. 12(b)(6).").

**B.    Defendants' Counterclaims**

The Court next turns to Plaintiffs' motion for summary judgment in their favor on Defendants' counterclaims. The Court considers each counterclaim separately.

**1.    Breach of Contract**

Defendants' Amended Counterclaim alleges the following "breaches" of the Sales

---

[5] Alternatively, even if purported representations may have occurred in Washington, D.C. where the DOJ is headquartered, the elements of common law fraud are the same. *See Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977).

Agreement.  Plaintiffs' (1) failure to honor the terms of the "Employment Plan" provision in the Business Prospectus & Entity Sale Agreement; (2) false representations that Regalmark had "no debts" and their accompanying failure to pay all outstanding debts; (3) failure to submit to Defendants a "certified copy" demonstrating that Plaintiffs paid off outstanding bank loans; (4) violating the non-compete provision of the Agreement; and (5) failure to submit an updated balance sheet.  Because Defendants have not generated any evidence in support of these claims, Plaintiffs' motion for summary judgment must be granted.

As to the first challenged breach, Defendants aver that various failures regarding Plaintiffs' promise to offer consulting services and to provide employees to assist with the business transition satisfy this claim.  ECF No. 43 ¶¶ 39, 40.  Defendants are mistaken.  The Sales Agreement unambiguously states that these issues would be negotiated in the future.  The Agreement specifically states that "[t]he buyer and seller *will negotiate and agree* to retain current *ownership or employees*."  ECF No. 68-12 at 12 (emphasis added).  Accordingly, the Agreement provides a mere "framework for [later] negotiation" rather than a "binding obligation" with respect to the employment plan.  *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 183 (2015).  Because "[a]greements to agree" are not enforceable contractual promises under Maryland law, the claim fails.  *See id.*

Second, as to the purported breach arising from Plaintiffs' misrepresentation that Regalmark had paid off its debts, the Sales Agreement makes clear that Plaintiffs agreed to "pay any and all outstanding debts related to the company."  ECF No. 68-13 ¶ 7(ii).  But when viewing the record most favorably to Defendants, no evidence supports that Plaintiffs breached this provision of the Agreement.  Indeed, the record clearly demonstrates that all preexisting debts identified in the Amended Counterclaims were paid off prior to closing.  *See* ECF No. 68-

11 at 3, 6; *see also* ECF Nos. 68-4 (Funding Circle), 68-5 (M&T), 68-6 (BlueVine).  Thus, because the record viewed most favorably to Defendants cannot support this breach theory, judgment must be granted to Plaintiffs.

Third, as to Plaintiffs' failure to provide a "certified copy" of proof that such debts were satisfied, no record evidence supports this contention.  Defendants' bare allegation alone cannot keep the claim alive.  *Int'l Waste Indus. Corp. v. Cape Env't Mgmt., Inc.*, 988 F. Supp. 2d 542, 558 n.11 (D. Md. 2013), *aff'd*, 588 F. App'x 213 (4th Cir. 2014).  The same is true with respect to Defendants' claim that Plaintiffs violated the Agreement's non-compete clause.  *See* ECF No. 43 ¶ 9.  Accordingly, and as a matter of law, neither assertion can form the basis of a successful breach of contract claim.

As to the purported failure to submit updated balance sheets, the record indisputably shows otherwise.  *See* ECF No. 68-1 at 36; *see also* ECF No. 68-23.  Plaintiffs routinely kept Defendants apprised of monies each party owed to the other, and no evidence exists to the contrary.  *See, e.g.*, ECF No. 15-3, 15-4, 15-5, 15-6, 15-7, 68-8, 68-10, 68-23.  Thus, even assuming that obligation constitutes a material term of the Sales Agreement, nothing suggests that Plaintiffs failed to honor it.

In sum, none of the Defendants' contract liability theories survive challenge.  On each summary judgment in granted in Plaintiffs' favor.  The Court next turns to Defendants' fraud claim.

## 2.    Fraud in the Inducement

Defendants aver that Plaintiffs fraudulently induced them to consummate the Sales Agreement in two principal ways.  First, Defendants aver that Plaintiffs "made misrepresentations . . . regarding the financial stability and status of Regalmark."  ECF No. 43

14

¶ 54.  To that end, Defendants maintain that Plaintiffs "represented there were no outstanding loan balances, liens, or judgments against Regalmark."  *Id.*  Second, Defendants contend that at the time the parties executed the Sales Agreement, Plaintiffs lacked a present intent to comply with the terms of the contract.  ECF No. 43 ¶ 55.  This, Defendants say, is shown by the fact that Plaintiffs "immediately acted against the interests of [Regalmark]," including by breaching the contract.  ECF No. 43 ¶ 56.

For this fraud claim to proceed, some record evidence must support the following elements: (1) that Plaintiffs made a false representation (2) about a material fact, (3) with knowledge of its falsity, (4) with intent to deceive, and (5) Defendants acted in reliance upon the claimed misrepresentation.  *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977) (citing cases).  Notably absent from the record is any evidence that Plaintiffs made *false* statements.  Nothing suggests that Plaintiffs misrepresented the financial status of Regalmark at the time of closing.  Nor does the record support Plaintiffs' lack of "present intent to comply" with the Agreement.  Accordingly, Plaintiffs are entitled to summary judgment on the fraud claim.

### 3.    Unjust Enrichment and Recission of Contract

Defendants' alternative liability theories—unjust enrichment and recission of contract— similarly fail.  Regarding the unjust enrichment counterclaim, Defendants offer three theories: (1) Plaintiffs were unjustly enriched by the $160,000.00 closing payment because Plaintiffs accepted the funds despite being in material breach of the Agreement; (2) Defendants were entitled to the entirety of the DOJ payments and, thus, Plaintiffs were unjustly enriched by the approximately $30,000.00 that Plaintiffs retained; and (3) Plaintiffs "wrongfully retained payments deposited into an M&T Bank account that rightfully belonged to [Defendants]."  ECF No. 43 ¶¶ 75–79.

With respect to the first two theories, no facts support that the Plaintiffs were in "material breach" of the Sales Agreement at the time of closing.  Nor does the record reflect that Defendants were entitled to the entirety of the DOJ payments remitted during the "transition" period.  As to the last theory, no evidence supports that any payments to the M&T account were "wrongfully" retained or that the same belonged to Defendants.  Thus, the unjust enrichment claim fails as a matter of law.

Likewise, the recission claim rests on Defendants' theory that they had been fraudulently induced to pay $160,000.00 at closing because Plaintiffs never intended to make good on the deal.  *See* ECF No. 43 ¶ 88.  As a result, Defendants maintain they may rescind the Agreement entirely.  *See id.*; *see also* 1 Corbin on Contracts § 1.6 (2021) (explaining that a party to a contract "has the power of avoidance" when the contract is induced by fraud).  Yet no evidence suggests the Sales Agreement was procured by fraud or under any other unconscionable circumstance.  Rather, the record indisputably demonstrates that Plaintiffs honored the terms of the Agreement, and so the recission claim is baseless.  Summary judgment is granted on this claim as well.

### 4.     Defamation

The last counterclaim, defamation, O'Neal alone pursues it against Paul Waskey arising from his email to MacGregor.  Although the alleged defamatory email has been identified, the record is silent as to where geographically MacGregor received the email, or relatedly, where O'Neal had been injured as a result.  And O'Neal is of no assistance in this regard.

The Court recognizes that where, as here, "the *lex loci delicti* rule fails to reach a satisfactory result on multistate defamation issues," it must instead adopt the "most significant relationship" test articulated in the Restatement (Second) of Conflict of Laws.  *See Ground Zero*

*Museum Workshop v. Wilson*, 813 F. Supp. 2d 678 (D. Md. 2011) (citing cases); *see also Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999).  This test considers "the state of [the claimant's] domicile, the state of [claimant's] principal activity to which the alleged defamation relates, and the state where [claimant] suffered the greatest amount of harm."  *See Ground Zero Museum Workshop*, 186 F.3d at 699.  The record indisputably supports that Regalmark operates in Washington, D.C. and that the parties conduct substantial business in Washington, D.C.  Further, the relevant email concerned a business opportunity for Regalmark in D.C.  Thus, because O'Neal would have suffered the greatest harm in D.C., the Court will apply D.C. common law on defamation.

For the defamation claim to survive summary judgment, O'Neal must adduce some evidence that Waskey (1) made a false and defamatory statement concerning her, (2) that he published that statement to a third party, (3) that he did so negligently, and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.  *See Carter v. Hahn*, 821 A.2d 890, 893 (D.C. 2003).  Viewing the record most favorably to O'Neal, the claim fails because no evidence supports the falsity of the email's contents.

To begin, O'Neal has failed to respond at all to Plaintiffs' summary judgment motion, so she has effectively abandoned the claim.  *See Bell v. Univ. of Md. Coll. Park Campus Facilities Mgmt.*, No. PX-17-1655, 2020 WL 978659, at *3 (D. Md. Feb. 28, 2020).  Furthermore, no evidence demonstrates that the challenged statement was either "untrue, or an opinion based implicitly on facts that are untrue."  *Nyambal v. Alliedbarton Sec. Servs., LLC*, 344 F. Supp. 3d 183, 192 (D.C. 2018) (quoting *Lane v. Random House*, 985 F. Supp. 141, 150 (D.D.C. 1995)).  Rather, the Waskeys have attested that O'Neal had "evaded" them and "locked" them out of their

17

accounts.  Record evidence also supports Paul Waskey's statement to MacGregor that O'Neal had breached the Sales Agreement.  Because no counter evidence exists that Paul Waskey's statements were untrue, the claim fails as a matter of law.  Summary judgment is granted in Paul Waskey's favor.

## IV.    CONCLUSION

The Court GRANTS summary judgment in Plaintiffs' favor as to their breach of contract and unjust enrichment claims because no genuine issues of material fact could lead to a contrary finding by a reasonable jury.  Accordingly, the undisputed record shows that Plaintiffs are entitled to $379,747.17 in damages.  The Court also DISMISSES Plaintiffs' fraud claim with prejudice because it fails as a matter of law.  Lastly, the Court GRANTS summary judgment in Plaintiffs' favor as to each of Defendants' counterclaims because, in the light most favorable to Defendants, no triable issues of fact could result in judgment entered in Defendants' favor.

A separate Order follows.


November 16, 2021                                                                    /s/
Date                                                                Paula Xinis
                                                                    United States District Judge